Opinion issued September 22, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-01029-CV

———————————

David LeBlanc, hedy leblanc, leblanc family investments limited
liability company, shreveport gp, llc, shreveport doctors hospital 2003, ltd.,
and shreveport hospital management, inc., Appellants

V.

B. John
Lange, III and Ethicus Healthcare Group, LLC, Appellees



 



 

On Appeal from the 129th District Court

Harris County, Texas



Trial Court Case No. 2005-79458

 



O P I N I O N

          Appellants
David LeBlanc, Hedy LeBlanc, LeBlanc Family Investments Limited Liability
Company, Shreveport GP, LLC, Shreveport Doctors Hospital 2004, Ltd., and
Shreveport Hospital Management, Inc. (collectively, “LeBlanc”) challenge the
trial court’s rendition of summary judgment in favor of appellees B. John
Lange, III (“Lange”) and Ethicus Healthcare Group, LLC (“Ethicus”) in LeBlanc’s
suit against Lange and Ethicus for declaratory judgment, breach of fiduciary
duty, legal malpractice, deceptive trade practices, negligent misrepresentation
and conspiracy.[1]  In five issues, LeBlanc contends that the
trial court erred in concluding as a matter of law that: (1) there was no
attorney-client relationship between LeBlanc and Lange; (2) there was no
“special relationship” between LeBlanc and Lange that gave rise to a fiduciary
duty; (3) the settlement agreement at issue here was fair; (4) Lange did not
breach a formal or informal fiduciary duty to LeBlanc; and (5) Lange was
entitled to summary judgment on the issues of illegality, duress, and
unconscionability.

          We
affirm.

Background

          This
suit arises out of a personal and business association that went bad.  Lange, an attorney, went into business with
LeBlanc, a businessman and long-time friend, and they formed several corporate
entities together.  When the interests of
LeBlanc diverged from those of Lange, the two fell out and this lawsuit ensued.


A.      The
Relationship Between LeBlanc and Lange

1.     Relationship Between LeBlanc and Lange Begins

          In 1987, Lange, who was a
partner in the corporate section of Andrews Kurth, came to be acquainted with
LeBlanc, who was employed with a healthcare company that was a client of
Lange’s.  Lange and LeBlanc’s
professional association developed into a social friendship, and the two men
went hunting together, golfed together, and on some occasions attended the same
family events.  According to Lange, the
two men “engaged in business and social matters together at all times during
[their] 18 year relationship.”   

2.     LeBlanc Founds LifeCare and LifeCare Retains
Lange 

          LeBlanc
co-founded LifeCare Hospital (“LifeCare”) in 1992.  Over the next 13 years, LifeCare grew from a
small hospital into a company that managed other long-term acute care hospitals
in twenty-two locations.  During that
time, LifeCare retained Lange to represent it in various corporate
transactions.  LeBlanc stayed with
LifeCare until 2003, when he was terminated as CEO.  LeBlanc contends that Lange was his personal
lawyer while he was CEO of LifeCare; Lange denies it.   

          When
LeBlanc was terminated as CEO of LifeCare in 2003, he sought Lange’s aid in
obtaining a lawyer for a number of disputes he had with LifeCare.  Lange told LeBlanc that he could not
represent him in his disputes with LifeCare, but instead introduced him to the
Houston law firm of Franklin, Cardwell & Jones, P.C. (“FCJ”).  LeBlanc retained FCJ in March 2003 to
represent him in his suits against LifeCare in Texas, and he retained the New
Orleans firm of Blue Williams, LLP to represent him in his suits against
LifeCare in Louisiana.  Those firms
continuously represented LeBlanc in all LifeCare matters until August 2005,
when LifeCare was sold.  LeBlanc’s lead
attorney at FCJ was Greg Jones.

3.    
LeBlanc Forms the Hospital
Partnership and the Management Company to Acquire and Manage the Hospital;
Lange Represents LeBlanc for the Acquisition 

 

          By
2003, when LeBlanc was terminated from LifeCare, Lange had joined the firm of
Jackson Walker, L.L.P.  Lange had an
extensive background in serving health care clients in buying and selling
hospitals, surgery centers, and other health care facilities and in forming
companies to develop projects.  LeBlanc
engaged Lange and Jackson Walker to help him acquire a healthcare facility he
could manage.  With the aid of Lange and
Jackson Walker, LeBlanc formed a Texas limited partnership called Shreveport
Doctors Hospital 2003, Ltd. (the “Hospital Partnership”).  Lange also created Shreveport Hospital
Management, Inc. (the “Management Company”), which initially served as the
general partner and manager of the Hospital Partnership.  Lange was the president and sole manager of
the Management Company.  The Hospital Partnership
acquired Doctors Hospital (the “Hospital”) in Shreveport, Louisiana in April
2004.  LifeCare was the sole tenant of
the Hospital pursuant to a 2004 lease that would be effective until June 2006.  Lange and Jackson Walker charged LeBlanc more
than $400,000 in attorney’s fees for these services.

4.     Lange Becomes a Full-Time Business Associate of
LeBlanc

          In
June 2004, after the acquisition of the Hospital in April, Lange left Jackson
Walker to join LeBlanc as an equal manager of the Hospital.  Lange, through his family trust, Perry Mound
Trust (“PMT”), and LeBlanc became minority limited partners in the Hospital
Partnership.  Lange and LeBlanc, through
their family entities, including the LeBlanc Family Investment Limited
Liability Company, were also the only shareholders, officers, and directors of
the Management Company.

          Lange
testified by deposition that when he left his law practice at Jackson Walker in
June 2004 to become LeBlanc’s full-time business associate in running the
Hospital he told LeBlanc that he was no longer his lawyer.  LeBlanc’s testimony similarly confirms that
he understood Lange to be “looking for an opportunity to get out of the
lawyering business” and, instead, to handle the legal side of the business
while LeBlance handled the operational side. 
However, LeBlanc asserts that Lange gave him no formal notice that he
would no longer represent him personally.

5.    
LeBlanc and Lange Pursue
Long Term Acute Care Business and Form Ethicus

 

          After
the purchase of the Hospital, LeBlanc and Lange set out to engage in the long
term acute care (“LTAC”) business.  They
planned to create Ethicus and intended it to be an LTAC management company much
like LifeCare.  The plan was for Ethicus
to open its first LTAC center in the Hospital after LifeCare’s 2004 lease
expired.  

LeBlanc and Lange needed investors
in Ethicus.  LeBlanc still owned stock in
LifeCare, the business he had helped develop. 
This stock, which was valuable but illiquid, would become very valuable
when LifeCare was sold.  Accordingly, in
order to attract investors, LeBlanc agreed to secure or pay back any
investments made in the Ethicus healthcare venture with the future sale
proceeds of his LifeCare stock.  Under
these terms, John Styles and Ronald Colichia agreed to invest in the venture.  As security for this guarantee, LeBlanc
signed a “Collateral Pledge Agreement” pledging his LifeCare stock to Styles
and Colichia.  Ultimately, Lange drew up
the papers and directed the creation of Ethicus.  Ethicus consisted of four members:  LeBlanc, Lange, Styles, and Colichia.

Lange’s first task after he joined
the management of the Hospital in June 2004 was to negotiate an extension of
the Hospital’s lease with LifeCare, its sole tenant, whose lease was about to
expire.  LeBlanc was excluded from these
negotiations due to his substantial ownership interest in LifeCare, which
created a potential conflict of interest with the Hospital.

          In
December 2004, on the advice of tax accountants, the Management Company was
replaced by a new Texas limited liability company, Shreveport GP, LLC
(“SGP”).  As with the Management Company,
SGP’s only officers and board members (called “managers,” rather than
“directors”) were LeBlanc and Lange.  As
Ethicus was intended to replace LifeCare as the lessee of the Hospital, SGP was
now the entity which had authority to lease out the Hospital.

6.    
LeBlanc Sells His LifeCare Interest
and Enters the Settlement Agreement

 

In 2005, LeBlanc was presented with
the opportunity to resolve his dispute with LifeCare by the sale of the company
to The Carlyle Group (“Carlyle”), which would enable him to sell his LifeCare
stock.  By the first quarter of 2005,
LifeCare and Carlyle were in negotiations over the sale of LifeCare’s stock to
Carlyle.  LeBlanc was represented in
these negotiations by Greg Jones and others at FCJ, as well as by Guice
Giambrone at Blue Williams.  An agreement
was reached for Carlyle to purchase LifeCare for more than $500 million in
cash.  As the holder of about 10% of
LifeCare’s equity, LeBlanc stood to earn approximately $50 million for his
LifeCare stock if the sale went through.

As conditions of the sale, however,
Carlyle insisted on two terms: (1) the execution of a non-competition agreement
by LeBlanc that would bar him from having anything to do with any LTAC business
nationwide for a period of five years; and (2) a one-year extension of
LifeCare’s lease at the Hospital, on the same terms as the 2004 lease.

Lange believed that both the
non-competition agreement and the lease extension were harmful to the Hospital
and to Ethicus, which had intended to lease the Hospital after LifeCare’s lease
expired.  Additionally, if LeBlanc signed
the non-competition agreement, LeBlanc would be required to sever all ties with
Ethicus in its plans to go into the LTAC business.  The outside investors, as well as Lange,
would be deprived of LeBlanc’s business experience and connections in the LTAC community.  Furthermore, the non-competition agreement
would preclude the Hospital from leasing to any LTAC business other than
LifeCare, including Ethicus, as long as LeBlanc was associated with the
Hospital.  Moreover, the lease-extension
provision would have the effect of precluding Ethicus from opening an LTAC
center in the Hospital before January 2007 at best (and not even then if
LeBlanc were still affiliated with the Hospital).  Ethicus would lose at least a year’s profit,
estimated by LeBlanc’s son Chris—an Ethicus employee at the time—to be about $4 million.  Thus, the
sale of LifeCare, burdened with those provisions, would benefit LeBlanc in the
amount of $50 million and more, while operating negatively on Ethicus and the
Hospital, two entities that he and Lange co-managed.  These conditions presented a conflict of
interest between LeBlanc personally, on the one hand, and Ethicus and the
Hospital, which he and Lange co-managed, on the other.

LeBlanc did not have the power to
comply unilaterally with Carlyle’s conditions. 
As an interested party, he could not sign the lease extension.  Instead, only Lange, as the sole
disinterested principal of the Hospital, could commit the Hospital to an
extension of the LifeCare lease.  LeBlanc
had to approach Lange to fulfill Carlyle’s conditions. 

Lange thus became involved in the
matters involving the lease extension and the non-competition agreement on
behalf of the Hospital and Ethicus.   He
and LeBlanc discussed a number of options to solve the conflict of interest.
Lange asked for and received a draft of the non-competition agreement and, in
an email dated June 12, 2005, addressed “quick comments” to LeBlanc on the
draft agreement.  These comments were
also sent to the officers of the Hospital and Ethicus and to a paralegal at
FCJ, Renee Hepler, who was then working on LeBlanc’s file and whom Lange
subsequently hired for Ethicus.  In the
comments, Lange pointed out problems the non-competition agreement could create
for the Hospital and Ethicus.  

On June 27, 2005, Lange wrote to
Greg Jones at FCJ, LeBlanc’s lead attorney in LeBlanc’s dispute with LifeCare
and the sale of LeBlanc’s LifeCare stock, and to Hepler, requesting the most
recent draft of the non-competition agreement “to look at it from the
standpoint of the Hospital Partnership and Ethicus.”  In it, Lange pointed out the Hospital’s and
Ethicus’s objections to the agreement. 
He followed up on this email the next day with another email to Jones.
In it, Lange stated that, with respect to the proposed lease extension, “David
[LeBlanc] doesn’t have the authority to without my consent to agree to anything
on that.”  Therefore, he told Jones, “we
do need to address my comments sent yesterday regarding [the relevant section
of the lease]” and,  “[a]s for the rest
of the non-compete and release, that is between you guys,” i.e., between
LeBlanc and his attorneys at FCJ and Blue Williams.

In addition, Lange sent a two-page
memo to LeBlanc, which stated,

I want to put in writing my
reasons for the position I’m taking with both Doctors Hospital and Ethicus in
connection with the realization of your sale of your interest in LifeCare and
execution of your nationwide non-compete agreement.  As a Manager of Shreveport GP, LLC, Ethicus
Healthcare Group, LLC, and Ethicus Healthcare Management, LLC, I have a duty to
each of those entities and their respective businesses; accordingly my actions
are intended to fully fulfill those duties.

 

Finally, in July 2005, at a meeting
with Lange, Styles, and LeBlanc’s son Chris, who was an Ethicus employee and
LeBlanc’s emissary, the outlines of a Settlement Agreement that could address
all parties’ interests with respect to the non-competition agreement and lease
extension were agreed upon by the interested parties.  Two days later, Lange e-mailed LeBlanc a
draft of the Settlement Agreement.  The
Settlement Agreement provided that the Hospital would extend the lease to
LifeCare, thus paving the way for the sale of LifeCare to Carlyle and LeBlanc’s
realization of $50 million on the sale of his stock.  It also provided that LeBlanc make a $3 million
payment to Ethicus to compensate it for its loss due to the extension of the
lease.  The $3 million compensation
figure was offered by Styles based on Chris LeBlanc’s estimate that Ethicus’s
lost profit for its first full year as licensed LTAC facility in the Hospital
would be about $4 million.  The agreement
further provided that Syles and Colichia would release LeBlanc’s LifeCare stock
from its pledge to Ethicus so that the sale of the stock to Carlyle could go
forward.   

Over the next few days, LeBlanc
reviewed numerous drafts of the agreement and had numerous telephone
conversations with Lange about it.  At
the same time, LeBlanc was being pressured by Carlyle to resolve his differences
with his business associates so that an executed non-competition agreement
could be in place in advance of the closing of the LifeCare sale.  

LeBlanc signed the Settlement
Agreement on July 14, 2005.  As required
by the agreement, Lange immediately signed and forwarded to Carlyle the lease
extension that he had negotiated with LifeCare, and Styles and Colichia
released the pledge on LeBlanc’s LifeCare stock.

Five days later, on July 19,
LeBlanc signed the non-competition agreement. 
LeBlanc received the initial installment on the sale of his LifeCare
stock, about $45 million, on August 12, 2005. 

          All
of the foregoing facts support Lange’s statements that he was not representing
LeBlanc personally, that, instead, he was representing the Hospital and Ethicus
or was dealing at arm’s length with LeBlanc as one businessman with another,
and that LeBlanc was represented with respect to all LifeCare matters by FCJ
and Blue Williams. 

          LeBlanc
produced no controverting summary judgment evidence showing that he understood
Lange to be representing his interests, rather than those of the Hospital or
Ethicus, with respect to the sale of his interest in LifeCare, the extension of
the lease, and the execution of the non-competition agreement.  Nor did LeBlanc produce any evidence that
Lange, and not FCJ, was representing his interests with respect to the
non-competition agreement when Lange sent emails to Jones and Hepler taking the
position of the Hospital and Ethicus against LeBlanc. 

          To
the contrary, corroborating Lange’s testimony, Jones testified by affidavit
that he was the lead attorney for LeBlanc in litigation in Dallas County, Texas
related to LeBlanc’s claim of ownership in LifeCare and that the case
ultimately settled on August 8, 2005, culminating in LeBlanc’s recovery and the
sale of his stock for more than $50 million. 
Jones averred that LeBlanc was also represented in the stock sale “by
several other lawyers, including Randolph Ewing of FCJ and Guice Giambrone of
the Louisiana firm of Blue Willliams, LLP.” 
Jones’ affidavit also confirmed his belief that Lange “was acting on
behalf of the Hospital and Ethicus and not on behalf of Mr. LeBlanc” because
“Mr. LeBlanc had interests that were separate from and adverse to the Hospital
and Ethicus.”  Jones further averred that
he recalled nothing in his dealings with Lange or LeBlanc that suggested the
existence of an attorney-client relationship between Lange and LeBlanc in July
2005.   

According to the Settlement
Agreement, LeBlanc was supposed to wire the $3 million to Ethicus on the next
business day after the closing of the stock sale, August 15.  Instead, on that day, LeBlanc filed this suit
to set aside the Settlement Agreement in Collin County, contrary to the
exclusive venue selection provision of the Settlement Agreement. 

B.      The Summary Judgments

LeBlanc alleged claims  against Lange, PMT, Ethicus, Styles,
Colichia, and Hepler for declaratory judgment, breach of fiduciary duty, legal
malpractice, violations of the Deceptive Trade Practices Act (“DTPA”), negligent
misrepresentation, and conspiracy.  
Ethicus counterclaimed for breach of contract and fraudulent inducement
to enter the Settlement Agreement. 

On August 28, 2006, Lange, PMT, and
Hepler filed a summary judgment motion that sought to dismiss LeBlanc’s claims
for breach of fiduciary duty.  On the
same day, Ethicus filed a motion for summary judgment on LeBlanc’s declaratory
judgment claim and Ethicus’s counterclaim for breach of contract.  On September 11, 2006, LeBlanc filed a
combined response to these motions. 
These motions were heard on September 18, 2006.  After the hearing, both sides moved to
supplement their respective summary judgment evidence.  

On February 26, 2007, the trial
court granted Ethicus partial summary judgment on LeBlanc’s declaratory
judgment claim seeking to void the Settlement Agreement, thereby dismissing
LeBlanc’s claims against Lange for legal malpractice, breach of fiduciary duty,
breach of contract, DTPA violations, fraud, negligent misrepresentation, and
conspiracy.  The trial court also rendered
partial summary judgment in favor of Ethicus on its counterclaim for $3 million
for breach of contract, dismissing LeBlanc’s affirmative defenses of duress,
unconscionability, and lack of consideration. 
And it granted summary judgment on all of LeBlanc’s original tort claims
against Lange.  That same day, the trial
court also granted Lange’s unopposed motion to supplement the summary judgment
evidence, but it denied LeBlanc’s motion.

On December 13, 2007, Lange moved
for no-evidence and traditional summary judgment on LeBlanc’s claims of breach
of informal fiduciary duty based on a “special relationship.”  Two weeks later, Ethicus moved for no
evidence summary judgment on LeBlanc’s illegality claim.  LeBlanc responded to both.  

On May 16, 2008, the trial court granted
these motions, holding as a matter of law that no “special relationship”
existed between LeBlanc and Lange that created a fiduciary duty, and it dismissed
LeBlanc’s affirmative defense of illegality. 


LeBlanc appeals from these summary
judgments, which were finalized by the final judgment entered by the trial
court on September 24, 2008.

Summary Judgment Standard of Review

          To
prevail on a summary judgment motion, a movant has the burden of proving that
it is entitled to judgment as a matter of law and that there is no genuine
issue of material fact.  Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341
(Tex. 1995).  When deciding whether there
is a disputed, material fact issue precluding summary judgment, evidence
favorable to the non-movant will be taken as true.  Nixon
v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985).  Every reasonable inference must be indulged
in favor of the non-movant and any doubts must be resolved in his favor.  Id.
at 549.

Attorney-Client Relationship

          In
the first part of his first issue, LeBlanc asserts that the trial court erred
in rendering summary judgment against him because there is a genuine issue of
material fact as to whether an attorney-client relationship existed between
Lange and himself at the time the Settlement Agreement was executed in 2005.

The attorney-client relationship is
contractual.  Vinson & Elkins v. Moran, 946 S.W.2d 381, 405 (Tex.
App.—Houston [14th Dist.] 1997, writ dism’d by agr.).  An attorney must agree to render professional
services for a client.  Id.  In
order to establish the relationship, the parties must either explicitly or by
their conduct manifest an intent to create it. 
Id.  To make the determination of whether there
was an agreement or meeting of the minds to form such a relationship, courts
must use objective standards of what the parties said and did.  Tanox,
Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P., 105 S.W.3d 244, 254
(Tex. App.—Houston [14th Dist.] 2003, pet. denied).  One party’s subjective belief that such a
relationship was formed is not sufficient. 
See id.; see also Span Enters. v. Wood, 274 S.W.3d 854, 858 (Tex. App.—Houston
[1st Dist.] 2008, no pet.) (“We determine whether an [attorney-client] contract
can be implied using an objective standard, . . . and we do not consider [the
parties’] unstated, subjective belief.”). 
Under Texas law, an attorney-client relationship terminates upon
completion of the purpose of the employment, absent an agreement to the
contrary.  Stephenson v. LeBoeuf, 16 S.W.3d 829, 836 (Tex. App.—Houston [14th
Dist.] 2000, pet. denied).  LeBlanc has
produced no evidence of any tangible agreement to the contrary.  

          Both
parties agree that Lange represented LeBlanc in the acquisition of the Hospital
in 2003.  The parties disagree, however,
about the scope and duration of that representation.  

Lange claims that, prior to and
after the engagement for the acquisition of the Hospital, he never represented
LeBlanc personally. He testified that he told LeBlanc that he could not
represent him in his disputes with LifeCare, but instead introduced him to the
Houston law firm of FCJ.  

The uncontroverted summary judgment
evidence shows that LeBlanc did retain FCJ in March 2003 to represent him in
his suits against LifeCare in Texas, that he retained the New Orleans firm of
Blue Williams to represent him in his suits against LifeCare in Louisiana, and
that he was represented by these attorneys in all matters related to LifeCare,
continuing through the sale of LeBlanc’s LifeCare stock to Carlyle in August
2005.  The summary judgment evidence also
confirms that Lange left his law practice at Jackson Walker in June 2004, and
joined LeBlanc in managing the Hospital.  Lange testified that, at that time, he told
LeBlanc that he would no longer be serving as his attorney.  

There is also summary judgment
evidence that Lange subsequently represented the interests of Ethicus and the
Hospital against LeBlanc when the conflict between LeBlanc and those entitities
arose over the non-competition agreement and lease extension sought by Carlyle
in connection with its purchase of LifeCare and that Lange made his
representation of these entities and his duties to those entities known to
LeBlanc.  Lange’s testimony, the email
exchanges over the non-competition agreement and lease extension in the summer
of 2005, and the memo Lange sent to LeBlanc at that time all attest that Lange
represented the interests of the Hospital and Ethicus in that dispute, as
opposed to those of LeBlanc, due to the conflict of interest between LeBlanc
and those entities and that he made his representation of those entities clear
to LeBlanc.

LeBlanc did not present evidence
contradicting Lange’s claim that Lange told him that Lange would no longer be
serving as his attorney in 2004, nor did he rebut Lange’s other summary
judgment evidence.  Moreover, LeBlanc
does not contend that there were any fee agreements, written contracts, bills,
or any other tangible, written evidence of an attorney-client relationship
between Lange and LeBlanc after the conclusion of Lange’s representation of
LeBlanc during the acquisition of the Hospital while at Jackson Walker.  He does, however, point to the lack of formal
notification from Lange at that time.[2]

As rebuttal, LeBlanc primarily
relies upon his own testimony that Lange had been his personal lawyer since
1987 and continued to be so through the signing of the Settlement Agreement.  LeBlanc’s affidavit states that he believed
that Lange “would act in [his] best interest.”  LeBlanc also points to his own deposition
testimony that “Lange was my attorney before, he’s been my attorney all along
and he was the attorney—my attorney
all the way up to the end,” as evidence of an attorney-client relationship
between Lange and himself at the time the Settlement Agreement was executed. 

Texas law is clear, however, that a
party’s subjective belief is not evidence of an attorney-client
relationship.  Wood, 274 S.W.3d at 858; Tanox,
Inc., 105 S.W.3d at 254.  Likewise,
conclusory statements are no evidence of the matter they seek to prove.  See
Dolcefino v. Randolph, 19 S.W.3d 906,
918 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing Lewelling v. Lewelling, 796 S.W.2d 164,
167 (Tex. 1990)).  Moreover, Texas Rule
of Civil Procedure 166a(c) provides that testimony of an interested witness may
be summary judgment evidence, but only if it “could have been readily controverted.”  See
Tex.
R. Civ. P. 166a(c).  LeBlanc’s subjective belief cannot be readily controverted; and, thus,
his statements concerning his belief in Lange’s alleged continuing role as his
attorney do not meet the standard for competent summary judgment evidence.

LeBlanc’s affidavit also states
that he asked Lange to review and counsel him on the non-competition agreement he
was required to sign in conjunction with the sale of his LifeCare stock.  The affidavit does not, however, state
whether Lange agreed to “counsel”
LeBlanc as his attorney, nor does it state what “counsel,” if any, Lange
gave.  Nor is there any summary judgment
evidence that Lange counseled LeBlanc as his attorney with respect to the
non-competition agreement.  Rather, the evidence
is to the contrary.  

LeBlanc, however, goes on to point
out various legal actions that Lange undertook after June 2004.  These are: (1) the creation of Ethicus and
the attendant legal work; (2) the creation of the documents evidencing LeBlanc’s
obligations to Ethicus’s members; (3) counsel Lange gave LeBlanc on how Ethicus
should be structured from a management standpoint; and (4) counsel Lange gave
LeBlanc on the content of the governing documents for the Management
Company.  Each of these actions may have
involved legal work on the part of Lange. 
LeBlanc, however, provides no summary judgment evidence that Lange
performed these actions for LeBlanc as his personal attorney.  Indeed, the facts of the case establish the
contrary.  LeBlanc and Lange were both
principals in the business entities concerning which Lange allegedly counseled
LeBlanc.  Lange had also operated as
general counsel for the Hospital.  In
both capacities, Lange owed fiduciary duties to the entities, not to his
business associate, as he pointed out in his memo to LeBlanc.  See
Redmon v. Griffith, 202 S.W.3d 225, 233 (Tex. App.—Tyler 2006, pet. denied)
(holding that corporate officers owe fiduciary duties to corporations, not
individual shareholders).  Any legal
activities that Lange performed concerning his and LeBlanc’s mutual enterprises
are logically explained as having been performed on behalf of these enterprises
to which he owed unquestionable duties, as opposed to being performed on behalf
of his business associate.  LeBlanc has
produced no summary judgment evidence to the contrary.

          LeBlanc
also relies on the e-mail Lange sent to him and other interested persons on
June 12, 2005, including Hepler at FCJ, LeBlanc’s law firm for LifeCare
matters, forwarding Lange’s comments on the non-competition agreement.  Far from reflecting that Lange was giving
LeBlanc counsel as to LeBlanc’s own personal interests in signing the
non-competition agreement, the comments reflect that Lange’s perspective was
taken in the interest of fulfilling his duties to the business entities—the Hospital and Ethicus.  Lange objected to the referenced portions of
the non-competition agreement as they threatened to impinge on these
entities.  He pointed out the problems
with signing the agreement as drafted because it would compromise the rights of
the business entities.  He further noted
that LeBlanc could not sign the agreement as written because it would require
him to answer for the Hospital, which LeBlanc “can’t commit for.”  These actions do not provide any evidence that
Lange gave advice for LeBlanc’s benefit or personal interest.  Rather, the evidence establishes that Lange’s
concern was for the business entities.

The only remaining comments in
Lange’s email to LeBlanc on the non-competition agreement that do not specifically
refer to the interests of the business entities are: (1) Lange’s comment in the
e-mail that “[u]nless you absolutely have to, I wouldn’t raise any red flags
until you are required to actually sign something,” and (2) Lange’s comment
that the requirement that LeBlanc give LifeCare notice of virtually any
business with which he had any connection was “ridiculous” and “bizarre.”  Such casual, incidental comments, contained
as they are in a document which clearly reveals that Lange was representing the
interests of the business entities, and not LeBlanc’s personal interests, do
not raise a genuine issue of material fact that would preclude the rendition of
summary judgment.   

Finally,
LeBlanc cites to the June 27 e-mail from Lange to LeBlanc’s counsel, Jones, at FCJ
as evidence of the existence of an attorney-client relationship between Lange
and LeBlanc at the time of the signing of the Settlement Agreement.  A review of this e-mail, however, reveals
once again that Lange’s interests, far from being aligned with those of LeBlanc
as his client, were instead adverse:  

From
my standpoint, I am not going to agree to the 1 year extension of the lease if
Section 7 stays in place, because (i) right now it applies to Ethicus in the
Shreveport market and would extend that application for an extra year (which I
am not able to tolerate), and (ii) it hampers our ability to sell the hospital
after the Lifecare closing (and thus impairs its value).

 

This first sentence negates any possible
construction of the e-mail as one from an attorney to his client.  Instead, the e-mail is consistent with
Lange’s position as a principal in the business entities who was putting the
business entities’ interests above that of LeBlanc.

We conclude that LeBlanc’s summary
judgment evidence fails to raise a genuine issue of fact concerning the
existence of an attorney-client relationship between Lange and LeBlanc at the
time the Settlement Agreement was executed. 
Therefore, the trial court did not err in holding that no attorney-client
relationship existed between Lange and LeBlanc at the time the Settlement
Agreement was entered and the sale of LeBlanc’s LifeCare stock took place.

Denial of Leave to Supplement Summary Judgment Record

          In
the second part of his first issue, LeBlanc contends that the trial court erred
by denying him leave to supplement the summary judgment record.  We disagree.

          After
the motions and responses had been filed and after the summary judgments had
been argued at an oral hearing, LeBlanc sought to introduce more summary
judgment evidence in his favor.  The
trial court denied his motion.

          The
rule governing summary judgments in Texas is clear:  “Except on leave of court, the adverse party,
not later than seven days prior to the day of the hearing may file and serve
opposing affidavits or other written response [to a summary judgment
motion].”  Tex. R. Civ. P. 166a(c). 
Thus, a party seeking to late-file a response to a motion for summary
judgment must seek leave of court.  This
leave should be granted when a litigant establishes good cause for failing to
timely respond by showing that (1) the failure to respond was not intentional
or the result of conscious indifference, but the result of accident or mistake,
and (2) allowing the late response will occasion no undue delay or otherwise
injure the party seeking summary judgment. 
Carpenter v. Cimarron Hydrocarbons
Corp., 98 S.W.3d 682, 688 (Tex.
2002).  A trial court’s ruling on a
motion for leave to file a late summary judgment response is reviewed for an
abuse of discretion.  See id. at 686.  A trial court abuses its discretion when it
acts without reference to any guiding rules or principles.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

          In
this case, LeBlanc failed entirely to present a reason for the late-filing of
the evidence.  He did not claim accident
or mistake.  Instead, he merely offered
the evidence “in the interest of fairness and justice.”  Thus LeBlanc failed to show good cause for
the late-filed evidence, and the trial court did not abuse its discretion when
it denied the motion.  Carpenter, 98 S.W.2d at 686, 688.  

          We
hold that the trial court did not err in denying LeBlanc leave to supplement
the summary judgment record.

We overrule LeBlanc’s first issue.

“Special Relationship” Creating
Fiduciary Duty

          In
his second issue, LeBlanc contends that the trial court erred in rendering
summary judgment that, as a matter of law, there was no “special relationship”
between himself and Lange that would give rise to an informal fiduciary duty on
Lange’s part.  We disagree.

          It is
well settled in Texas that not every relationship involving a high degree of
trust and confidence rises to the stature of a fiduciary relationship.  Meyer
v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005). 
Texas courts have recognized an informal fiduciary duty that arises from
“a moral, social, domestic or purely personal relationship of trust and
confidence.” Associated Indem. Corp. v.
CAT Contracting, Inc., 964 S.W.2d 276, 287 (Tex. 1998).  However, courts “do not create such a
relationship lightly.”  Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 177 (Tex. 1997).  To impose
such an informal fiduciary duty in a business transaction, the special
relationship must exist prior to and apart from the agreement made the basis of
the suit.  Associated Indem. Corp., 964 S.W.2d at 288.  When all the underlying facts are undisputed,
determination of the existence of a fiduciary duty is a question of law for the
court.  See Nat’l Med. Enters., Inc.
v. Godbey, 924 S.W.2d 123, 147 (Tex. 1996). 


          The
facts upon which LeBlanc depends to impose a fiduciary relationship upon Lange
are all found in his affidavit, are uncontested, and are as follows:

·       
Long-term business and personal relationship since 1987;

 

·       
Unspecified hunting trips in Mexico and Texas in which they sometimes
roomed together and once took their sons;

 

·       
Lange’s attendance at various golf outings with LeBlanc and his family;

 

·       
LeBlanc’s attendance at Lange’s father’s funeral;

 

·       
Frequent family dinners together;

 

·       
Lange’s attendance at LeBlanc’s son’s engagement party and his wedding;

 

·       
LeBlanc’s assertions that he “considered Lange my lawyer, friend and
business partner” and his belief “that Lange would act in my best interest.”

 

These
undisputed facts, however, do not give rise to a “special relationship” that
creates a fiduciary duty.   

The Texas Supreme Court faced a
similar situation in Meyer.  In that case, Cathey sued Meyer for fraud and
breach of fiduciary duty arising out of their four-year collaboration on eight
real estate development projects, two of which were at issue on appeal.  It was undisputed that Meyer, the party as to
whom a “special relationship” was asserted, was always in charge of all aspects
of the projects and made the final decisions. 
Meyer, 167 S.W.3d at 330.  Furthermore, Meyer controlled the financing
and the books, and the court of appeals found that “Cathey relied on and
trusted Meyer to treat him fairly and keep accurate financial records.”  Id.  Moreover, Cathey considered Meyer a
friend.  He testified that they ate lunch
together every day for four years.  Id.  The court of appeals reversed a take-nothing judgment in favor of Meyer
on breach of informal fiduciary duty.  Id.  The
supreme court unanimously reversed on the same issue, stating, “We disagree
that these facts establish a fiduciary relationship.”  Id.  The supreme court was unmoved by the fact
that Meyer and Cathey had worked on prior projects together.  It held that “[t]hese earlier projects were
arms-length transactions entered into for the parties’ mutual benefit, and thus
did not establish a basis for finding a fiduciary relationship.”  Id. at
331.     

In the same way, LeBlanc’s and
Lange’s dealings with respect to the Settlement Agreement were arm’s-length
transactions entered into for the parties’ mutual benefit as principals of the
Hospital and Ethicus.  Not only were
LeBlanc and Lange dealing with each other as sophisticated businessmen, but
Lange had made clear to LeBlanc that Lange had a duty to represent the
interests of the Hospital and Ethicus due to LeBlanc’s conflict of interest
with those entities, and LeBlanc was represented throughout these dealings by FCJ
and Blue Williams.  Such dealings provide
no basis for finding a fiduciary relationship between Lange and LeBlanc.

Furthermore, the fact that LeBlanc
and Lange had been friends for years does not justify imposing a fiduciary duty
on Lange.  “Neither is the fact that the
relationship has been a cordial one, of long duration, evidence of a
confidential relationship.” 
Crim Truck & Tractor Co. v.
Navistar Int’l Transp. Corp., 823 S.W.2d 591, 595 (Tex. 1992), superseded by statute on other grounds, Subaru of Am., Inc. v. David McDavid
Nissan, Inc., 84 S.W.3d 212, 225–26 (Tex. 2002).  

Moreover, LeBlanc’s subjective
trust in Lange is not determinative of a “special relationship.”  As the supreme court has held, “mere
subjective trust does not . . . transform arm’s-length dealing into a fiduciary
relationship.”  Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998)
(quoting Swanson, 959 S.W.2d at
177).  

The Fourteenth Court of Appeals
reached the same conclusion in Dodson v.
Kung, 717 S.W.2d 385 (Tex. App.—Houston [14th Dist.] 1989, writ ref’d
n.r.e.).  In Dodson, Dodson met Kung when Dodson was a “skeet boy” at Lakeside
Country Club, and they developed a personal relationship, which each described
as “both father/son” and “mentor/protégé.” 
Id. at 387.  Some years later, Dodson went to work for a
company started by Kung, and when promises made by Kung were not fulfilled, Dodson
sued, claiming a breach of an informal fiduciary duty.  Id.  The trial court rendered summary judgment
against Dodson on that issue and the Fourteenth Court agreed.  Id.  The court acknowledged that the
relationship was one of business and friendship.  Id.
at 389.  Furthermore, it acknowledged
that Kung “was in a superior position because of his wealth and business
experience. . . .”  Id. 
However, the court observed that Dodson was not a “naïve young man” when
he went to work for the company: “He was 36 years old, had operated his own
business at a profit and was familiar with contracts and litigation.”  Id.  Most importantly, there was “no evidence that
these men were not dealing at arms length and on equal terms.”  Id.  Accordingly, the court held that there was no
fact issue raised as to breach of a fiduciary duty.  Id.

Here, LeBlanc co-founded LifeCare
in 1992 and remained its CEO for more than a decade.  The summary judgment evidence establishes
that Lange and LeBlanc were equal partners, and there is no evidence that Lange
held any superior position with regard to sophistication or business
acumen.  As succinctly stated by the
Fourteenth Court of Appeals, “There is no evidence that these men were not
dealing at arms length and on equal terms. 
There is, therefore, no fact issue raised as to . . . breach of
fiduciary duty.”  Id.  Likewise, in this case,
there is no evidence that these two men—both experienced in buying and selling hospitals and other health care
facilities, in forming companies, and in managing health care facilities—were dealing on anything but equal terms, in
arm’s-length ventures.  

We hold that the trial court did
not err in concluding that no special relationship giving rise to a fiduciary
duty existed between Lange and LeBlanc.

We overrule LeBlanc’s second issue.

Fairness of the Settlement Agreement

In his third issue, LeBlanc
contends that the trial court erred in ruling as a matter of law that the
Settlement Agreement was fair.  LeBlanc
argues that, as Lange owed him a fiduciary duty, the Settlement Agreement is
presumed unfair and that it is Lange’s burden to prove its fairness.  As we have held, however, that Lange did not
owe a fiduciary duty to LeBlanc, either as his attorney or pursuant to a
“special relationship,” this point is moot.[3]  

We overrule LeBlanc’s third issue.

Breach of Fiduciary Relationship

In his fourth issue, LeBlanc
contends that the trial court erred in rendering summary judgment because there
is a fact issue concerning whether Lange breached his fiduciary duty to
him.  As we have held, however, that
Lange owed no formal or informal fiduciary duty to LeBlanc, this point is moot.

We overrule LeBlanc’s fourth issue.

Remainder of LeBlanc’s Claims Against
Lange

Lastly, in his fifth issue, LeBlanc
complains that the trial court erred in rendering summary judgment on his
remaining claims.  We disagree.

A.      Fraud
and Misrepresentation

          Lange moved for, and the
trial court rendered, summary judgment on LeBlanc’s fraud and misrepresentation
causes of action on the basis that there is no evidence that Lange made any
material misrepresentations or that LeBlanc relied to his detriment on any such
misrepresentations.  LeBlanc claims that
this was error.  LeBlanc also argues
that, because Lange owed him a fiduciary duty, Lange had a duty to disclose
material information to him.  

          A
fiduciary’s concealment of material information can be the basis for
fraud.  Spoljaric v. Percival Tours, Inc., 708 S.W.3d 432, 435 (Tex.
1986).  As we have already held that
Lange did not owe LeBlanc a fiduciary duty, however, it follows that Lange did
not owe LeBlanc a duty of disclosure.

Nor has LeBlanc raised a fact issue
regarding a material misrepresentation by Lange to him.  A defendant who moves for traditional summary
judgment must conclusively disprove at least one element of the plaintiff’s
cause of action.  Little v. Tex. Dep’t of Criminal Justice, 148 S.W.3d 374, 381 (Tex.
2004).  The elements of fraud are as
follows: (1) that a material misrepresentation was made; (2) the representation
was false; (3) the speaker knew it was false when made or made it recklessly
without any knowledge of the truth and as a positive assertion; (4) the speaker
made the representation with the intent that the other party should act upon
it; (5) the party acted in reliance on the representation; and (6) the party
thereby suffered injury.  Aquaplex, Inc. v. Rancho Valencia, Inc.,
297 S.W.3d 768, 774 (Tex. 2009).  

LeBlanc claims that Lange made a
material misrepresentation with respect to the purpose for changing the
Hospital’s general partner.  He claims
that, had he known that he was being replaced as president and sole
decision-maker for the Hospital, he would not have allowed it to happen.  His contention is that, but for the
misrepresentation, he, and not Lange, would have been in the position to sign
the leasing agreement, and, thus, he would not have had to sign the Settlement
Agreement in order to proceed with the sale of LifeCare.  

          The
evidence shows that Lange did represent to LeBlanc that LeBlanc could not sign
the lease extension on behalf of the Hospital because he had an interest in the
transaction that disabled him, as an interested principal of the business
entity, from unilaterally entering into such an agreement on behalf of the
company as a matter of statutory law. 
LeBlanc has produced no evidence that this statement, on which he bases
his fraud claim, was false, and the law is to the contrary.  See
Tex. Rev. Civ. Stat. Ann. art.
1528n, § 2.17 (Vernon Supp. 1997) (now-expired version of Texas Limited
Liability Company Act applicable to transaction in question) (current version
at Tex. Bus. Orgs. Code Ann. §
101.255 (Vernon Supp. 2009)).  Thus,
Lange has conclusively disproven an essential element of both negligent
misrepresentation and fraud. 

B.      DTPA
Violations

Lange moved for summary judgment on
LeBlanc’s claims under the DTPA, claiming that there was no evidence that
LeBlanc was a “consumer” as defined by the Act. 
The trial court granted this motion.

The DTPA defines a “consumer” as
“an individual, partnership, corporation, this state, or a subdivision or
agency of this state who seeks or acquires by purchase or lease, any goods or
services, except that the term does not include a business consumer that has
assets of $25 million or more . . . .”  Tex. Bus. & Com. Code Ann. §
17.45(4) (Vernon 2011).  Whether a person
is a “consumer” for DTPA purposes is a question of law.  Roberts
v. Healey, 991 S.W.2d 873, 881
(Tex. App.—Houston [14th Dist.] 1999, pet. denied).

LeBlanc’s claim that he was a
consumer is premised upon his claim that Lange was his attorney and, therefore,
he was a consumer of LeBlanc’s legal services. 
We have held, however, that no attorney-client relationship existed
between LeBlanc and Lange at any pertinent time.  LeBlanc has produced no other evidence that
Lange offered any goods or services for sale or lease to LeBlanc or that
LeBlanc purchased or leased any goods or services from Lange.  Accordingly, the trial court correctly
rendered summary judgment as to LeBlanc’s DTPA claims, and it is unnecessary to
address LeBlanc’s issues concerning his financial wherewithal. 

C.      Illegality of
Settlement Agreement[4]

LeBlanc claims that the Settlement
Agreement is illegal because it violates Penal Code section 32.43(b).  This section provides that “a person who is a
fiduciary commits an offense if, without the consent of his beneficiary, he
intentionally or knowingly solicits, accepts, or agrees to accept any benefit
from another person on agreement or understanding that the benefit will
influence the conduct of the fiduciary in relation to the affairs of his
beneficiary.”  Tex. Penal Code Ann.
§ 32.43(b) (Vernon 2011).

This commercial bribery statute
does not apply in this case.  Penal Code
violations do not give rise to private causes of action.  A.H.
Belo Corp. v. Corcoran, 52 S.W.3d 375, 379 (Tex. App.—Houston [1st Dist.]
2001, pet. denied).  Furthermore, to the
extent he is attempting to argue some common-law version of contract
illegality, LeBlanc has not proven that the Settlement Agreement was an illegal
contract.  As we have held that there is
no fiduciary relationship between LeBlanc and Lange, the only fiduciary
relationship in question here would be between Lange as manager of SGP, the
general partner of the Hospital, and Ethicus. 
There is no evidence that Lange agreed to accept any benefit from any
party without the consent of SGP and Ethicus. 
Indeed, there is no evidence that Lange agreed to accept any benefit
from any party without the consent of LeBlanc, as LeBlanc signed the Settlement
Agreement.  

As a matter of law, the statute
does not apply and the trial court correctly rendered summary judgment as to
the alleged illegality of the Settlement Agreement.

D.      Duress

LeBlanc also complains of the trial
court’s rendition of summary judgment on his affirmative defense of
duress.  The elements of duress are:  (1) a threat or action taken without legal
justification; (2) the action or threat was of such a character as to destroy
the other party’s free agency; (3) the threat or action overcame the opposing
party’s free will and caused it to do that which it would not otherwise have
done and that which it was not legally bound to do; (4) the restraint was
imminent; and (5) the opposing party had no present means of protection.  Chapman
Children’s Trust v. Porter & Hedges, L.L.P., 32 S.W.3d 429, 443 (Tex.
App.—Houston [14th Dist.] 2000, pet. denied).

LeBlanc attempts to meet the first
element of his affirmative defense of duress by arguing that Lange did not have
the legal right, i.e., justification, to refuse to extend the lease for several
reasons.  He claims that Lange did not
have the legal right because he had fraudulently placed himself in a position
of authority with the general partner of the Hospital.  Because we have found that LeBlanc, as an
interested party, was precluded as a matter of law from exercising such
authority personally in any case, this argument fails.  Next, LeBlanc claims that the refusal to
extend the lease violated Lange’s fiduciary duty to him.  Again, we have held that no such duty exists.  This argument also fails.  

Finally, LeBlanc argues that
refusing to extend the lease was against the best interest of the Hospital, to
which Lange owed a fiduciary duty as its lawyer and officer.  Even if a fact issue could be raised as to
whether refusing to extend the lease was against the best interest of the
Hospital, such an issue has no bearing on whether Lange, as the principal of
the general partner of the Hospital and as the only disinterested manager, had
a legal right or justification to extend or refuse to extend the lease.  As the only disinterested manager of the general
partner of the Hospital, Lange was the only person who did have the legal right
or justification to make decisions for the Hospital.  Thus, LeBlanc failed to conclusively
establish the first element of his duress claim.

E.      Unconscionability
of Settlement Agreement

Lastly, LeBlanc complains of the
trial court’s rendition of summary judgment on his action to declare the
Settlement Agreement void as “unconscionable.”

The unconscionability of a contract
is a question of law for the court.  Ski River Dev., Inc. v. McCalla, 167
S.W.3d 121, 136 (Tex.App.—Waco 2005,
pet. denied).  In Texas, the party
asserting unconscionability has the burden of proving both procedural and
substantive unconscionability.  Id. 


To determine procedural
unconscionability, courts examine “the contract formation process and the
alleged lack of meaningful choice.”  BDO Seidman, LLP v. J.A. Green Dev. Corp.,
327 S.W.3d 852, 858–59 (Tex. App.—Dallas 2010, no pet.).  Substantive unconscionability, on the other
hand, concerns the fairness in the contract provisions themselves.  See In
re Halliburton Co., 80 S.W.3d 566, 571 (Tex. 2002).  The grounds for substantive unconscionability
must be “sufficiently shocking or gross to compel the court to intercede, . . .
and the same is true for procedural abuse—the circumstances surrounding the negotiations must be shocking.”  McCalla,
167 S.W.3d at 136.

A review of the facts herein
reveals nothing “shocking” or “gross” either procedurally or
substantively.  LeBlanc stood to make $50
million from the sale of his LifeCare stock. 
The buyers, however, asked LeBlanc to sign a non-competition agreement
with terms that impinged upon the interests of LeBlanc’s and Lange’s mutual
business entities.  Lange asked to see
the agreement to determine its effect on the Hospital and Ethicus, whose
interests he represented.  From the
earliest time at which LeBlanc presented Lange with the non-competition
agreement, Lange made clear his objections to it on behalf of the business
entities, not only in communications with LeBlanc but in communications with
LeBlanc’s attorneys at FCJ.  The idea of
the Settlement Agreement arose in a meeting between Lange, Chris LeBlanc,
acting as LeBlanc’s emissary, and Styles on July 8, 2005 and was worked out in
these arm’s-length negotiations over a several-week period.  The $3 million compensation figure was
offered by Styles as compensation for freeing LeBlanc’s stock in LifeCafe from
its pledge to Ethicus’s investors.  The
figure was based on Chris LeBlanc’s estimate that Ethicus’s lost profit for its
first full year as licensed LTAC facility in the Hospital would be about $4
million.  

LeBlanc was a sophisticated
businessman, represented by counsel—FCJ in Houston and Blue Williams in New Orleans—who was being offered $50 million to buy his
stock.  Through his attorneys, he could
have asked Carlyle for revision of the offending terms of the non-competition
agreement.  LeBlanc might have felt that
he “had no choice” but to sign the agreement if he wanted to sell his LifeCare
stock, as he testified, and that he had no bargaining ability, but there are no
“shocking” facts suggesting procedural unconscionability in this business
adjustment among sophisticated businessmen. 

Likewise, nothing in the Settlement
Agreement itself suggests substantive unconscionability.  The Settlement Agreement represented a
business solution to a complex problem. 
It released LeBlanc’s LifeCare stock from LeBlanc’s pledge to the
Ethicus investors, it compensated Ethicus for the loss of profits due to the
lease extension for LifeCare, and it enabled LeBlanc to sell his LifeCare stock
for more than $50 million. These terms cannot be considered “shocking” or
“gross” from LeBlanc’s perspective.

Finally, a provision in the Settlement
Agreement whereby Lange had the option to buy LeBlanc’s interest in the
Hospital for $3.8 million was in no sense “shocking.”  Such a provision would make it possible to
free the Hospital from the disabilities imposed by LeBlanc’s non-competition
agreement and to provide substantial compensation to LeBlanc. We conclude that
there are no grounds for a finding of substantive unconscionability.  See McCalla,
167 S.W.3d at 136.

We hold that the trial court did
not err in ruling against LeBlanc as a matter of law on his claims of fraud,
misrepresentation, DTPA violations, illegality, duress, and unconscionability.

We overrule LeBlanc’s fifth issue.

 

Conclusion

We affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Justice
Sharp, concurring in the judgment only.

 

 

 











[1]
          LeBlanc also sued Perry Mound
Trust, Renee Hepler, John Styles, and Ronald Colichia, but he does not
challenge any portion of the trial court’s judgment as it relates to these
parties on appeal.





[2]
          LeBlanc points to a legal
opinion that Lange gave to the Hospital’s acquisition lender in December 2004
as evidence that Lange continued to represent him personally.  The opinion arose out of the substitution of
an LLC for the original corporate genral partner of the Hospital Partnership,
which required the consent of the Hospital’s acquisition lender and was given
by Lange as general counsel to the hospital Management Company and cited
Lange’s role in the acquisition while at Jackson Walker.  It is no evidence that Lange represented
LeBlanc personally in connection with any matter other than the acquisition of the
Hospital or he continued to represent LeBlanc after leaving Jackson Walker.





[3]
          In his appellate brief, LeBlanc
includes a one-line claim that the summary judgment evidence demonstrates that
at the time the Settlement Agreement was created “Lange owed LeBlanc a
fiduciary duty as . . . his business partner . . . .”  LeBlanc provides no argument or citation to
legal authority for this proposition.  To
assert an issue on appeal, an appellant’s “brief must contain a clear and
concise argument for the contention made, with appropriate citations to
authorities . . . .” Tex. R. App. P.
38.1(i).  An appellant waives an issue on
appeal if he fails to adequately brief that issue by presenting supporting
arguments and authorities.  See id.;
Brown v. Hearthwood II Owners Ass’n, Inc.,
201 S.W.3d 153, 161 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).  Accordingly,
this point is waived.





[4]           LeBlanc pled illegality, not as a
claim against Lange, but solely as a defense against the enforcement of the
Settlement Agreement.  This defense was
the subject of a separate summary judgment motion by Ethicus, which the trial
court granted.